## DEARING *vs.* LIGHTFOOT.

1. A written power to an agent, in charge of the plantation of his principal, "to act for him in all cases whatever, and to do all which he might himself do," coupled with subsequent verbal instructions, when about to break up the plantation and remove his family to another State, "to settle up or discharge all demands against the family before he (the agent) left, and, acting under the power of attorney, to do all that might be necessary," will not confer on the agent the authority to sell the slaves of his principal.

2. If an agent, transcending his authority, sells the slaves of his principal, and the principal ratifies the act, the purchaser is entitled to hold the slaves as against a prior unregistered mortgage, of which he had no notice at the time of such ratification.

3. The fact that a mortgage on property in this State is executed in another State, does not dispense with the necessity of registration in order to give it validity as against creditors and subsequent purchasers.

Error to the Circuit Court of Lawrence. Tried before the the Hon. George W. Lane.

This was an action of detinue by the plaintiff against the defendant in error to recover the possession of two slaves and damages for their detention. The plaintiff relied on a mortgage on the slaves in controversy, executed by one James Jackson, in the State of Georgia, to the said plaintiff, on the 24th October 1840. The defendant claimed title under a bill of sale from Dr. Henry M. Jackson, acting as the agent of the said James Jackson, bearing date in January 1842. Both James and Dr. Henry M. Jackson were examined under commission as witnesses. The former testified, that the slaves, at the execution of the mortgage, were on his plantation in Lawrence county, to which they had been removed by him from Tennessee in 1832: that when he left Courtland in December 1841, to return to Georgia, whence he intended removing his family, he gave "no special authority to Dr. Jackson to sell the two boys, Solomon and Hercules, but that he had some years before given him a general power of attorney to act for him in all cases whatever, and to do all which he himself might do: that in parting with his son, (Dr. Jackson) he told him to settle up all demands against the family, before he, the said Dr.

should set off for Montgomery, and acting under the power of attorney above to do all that might be necessary." This witness further stated, that the slaves in controversy were sold by his son, Dr. Jackson, to the defendant; "under a general power, verbally given, to discharge all demands against the family before he left Courtland for Montgomery." Dr. Jackson testified to the sale of the slaves to defendant by himself, "acting under a general power of attorney, (since lost or destroyed) from the said James Jackson, to manage all his business in the State of Alabama:" and that the purchase money was paid, by the defendant assuming two debts due by said James Jackson, to the amount of about eight hundred dollars and handing to the witness two hundred dollars in cash. There was other testimony, but it has no bearing on the questions involved in the case.

The plaintiff's counsel asked the court to charge the jury;

1st. That the agency of Dr. Henry M. Jackson, as set forth in his own and his father's depositions, was insufficient in law, to authorize the sale by him of the slaves Solomon and Hercules to the defendant, so as to vest the title of the said James Jackson in him:

2d. That if the defendant claimed under a purchase from Henry M. Jackson, as the agent of James Jackson, the agency shown in the testimony did not authorize the said Henry M. Jackson to sell the slaves to the said defendant, or any other person under whom defendant may claim.

The court refused to give either of these charges, to which refusal the plaintiff excepted, and now assigns it as error.

THOMAS M. PETERS, for plaintiff in error:

1. The mortgage in this case having been made in the State of Georgia, by parties residing at the time in that State, when at the same time the property conveyed was in this State, its registration here is not required to make it valid. Catterlin v. Hardy, 10 Ala. 514; Adams v. Broughton, adm'r, 13 Ala. 731. See brief in Dearing v. Watkins.

2. Generally, powers of attorney being special grants, are to be strictly construed, and the agent is restrained by the terms conferring his authority as applied to the subject matter of his agency. Beyond these, he cannot be allowed to go without the greatest mischiefs. A lax construction of an agent's

powers would put an end to the exercise to all corporate pow-ers and an infinity of commercial transactions of every day's occurrence, which are almost necessarily done by agents. Here the *business* of the principal in Lawrence county, was "planting" or farming—nothing else, and the agent was cloth-ed with powers to manage this interest—nothing more. But an agent to manage a farm has no power to sell it, or the things belonging to it: this would be a mode of *breaking* it up but not of carrying it on. Dig. Lib. Tit. 3, 1, 63; Pothier 3, Tit. 3. 64; Cod. Lib. Tit. 13, l. 16; Story on Agency, 86, § 71, et seq : Story Agen. 21, 143, §§ 21, 126 et seq. and cases there cited; Scarborough v. Reynolds, 14 Ala. 252; Rosseter v. Rosseter, 8 Wend. 494; Smith Mer. Law, Hol-combe & Gholson's editor ch. 5, p. 54, and notes.

3. There is no pretence that Dr. Jackson, had any express authority to sell the slaves here sued for, and it is denied that his general power of attorney to manage his father's business in Alabama conferred it. The charges asked were therefore proper and should have been given in the language requested. Cole v. Spann, 13 Ala. 537; Hinton v. Nelms, 13 Ala. 222; Clealand v. Walker, 11 Ala. 1059; Ivey v. Phifer, 11 Ala. 535.

4. The plaintiff shows the better title and ought to have re-covered.

L. P. WALKER, for defendant in error, contends that there is no error in the record, and cites 2 H. Black. R. 623, How-ard v. Baillie; Story's Ag. §§ 62, 85, 86, 89, 91, 239.

COLLIER, C. J.—Powers of attorney are ordinarily sub-jected to a strict construction, and the authority is never ex-tended beyond that which is given in terms, or is necessary and proper for carrying the authority so given into full effect. Consequently a power to sell, assign and transfer stock, will not include a power to pledge them for the agent's own debt. Nor will a power to bargain and sell land, include an author-ity to grant a license to the purchaser, previous to a convey-ance, to enter and cut timber on the land, though done *bona fide* with a view to effect the sale. Story on Ag. § 68. An authority to [manage the property of the principal has been held not to entitle the agent to alienate any part of it, except

that which was perishable. So an agent with power to superintend a farm, does not possess the power to sell it, or the things belonging to it. Id. § 71.

But in all cases, whether the agency be general or special, it is said to be a universal principle, that unless the inference is expressly excluded by other circumstances, it includes all the usual modes and means of accomplishing the objects and ends of the agency. Even an immaterial deviation by the agent from the appropriate course, will not vitiate his act, if he does not in substance exceed his right and duty. Story on Ag. § 85.

A power of attorney to collect debts, to execute deeds of lands, to accomplish a complete adjustment of all concerns of the constituent in a particular place, and to do all other acts which the constituent could do in person, does not authorize the giving a note by the attorney in the principal's name. The larger grant of power it was supposed should be construed with reference to the matters specially mentioned. Rossiter v. Rossiter, 8 Wend. Rep. 494. So a power of attorney " to ask, demand, sue for, recover, and receive all such sum or sums of money, debts, dues, accounts and other demands whatsoever, which are, or shall be due, owing, payable, and belonging to us, or detained from us in any manner of ways or means whatsoever, &c." does not authorize the attorney to compound for, receive and release a sum of money which is not due and payable. Hefferman v. Adams, 7 Watt's Rep. 716.

In Wood v. McCain, 7 Ala. Rep. 800, S., a practising physician, being about to leave home temporarily, made R. his agent by verbal appointment, with a general authority to transact all business for him in this State, and left with him his books and accounts for professional services " for settlement." It was held, that as it respected the books and accounts, the authority of the agent was restricted by the terms "for settlement;" and he was not authorised to assign them to a surety of his principal, to indemnify the surety against the consequences of his suretyship. In this case, the distinction between a *general* and a *universal* agent is recognized, and it was said that such an universal authority, as the latter may exercise, will never be inferred from any general expressions

however broad, but the law will restrain them to the particular business of the party, in respect to which, it is presumed, his intention to delegate the authority was principally directed. Thus, if a merchant in view of his temporary absence should delegate to an agent, the full and entire authority to sell his personal property, to buy any property for him, or on his account, or to make any contracts, or to do any acts whatsoever, which he could if personally present: These general terms would be limited to buying or selling, connected with his ordinary business as a merchant, and without some more specific designation, would not be construed to apply to a sale of his household furniture. See also Story on Ag. § 21.

The difference between a *general* and *special* agent, is said to be this: the former is appointed to act in the affairs of his principal generally, and the latter to act concerning some particular object. In the former case, the principal will be bound by the acts of his agent, *within the scope of the general authority conferred on him*, although those acts are violative of his private instructions and directions. In the latter case, if the agent exceeds the special authority conferred on him, the principal is not bound by his acts. Wood v. McCain, *supra;* Paley on Ag. 199; 15 Johns. Rep. 44; Story on Ag. §§ 21–22–125–126–127. See also Scarborough v. Reynolds, 12 Ala. 252. In the latter case, it was decided that a special authority conferred upon an agent, in the management of a plantation and the interests connected with it, to demand and sue for all monies, &c., the principal declaring that he subjected himself to be sued through his agent in the same manner as if he were personally present, does not give the agent power to execute a note in the name of the principal; nor does it authorize the agent to submit matters in dispute to arbitration, at least until after suit brought: *Further*, an authority to an agent stated thus, " if you can honorably and fairly settle with Reynolds out of court, do so, if not, let the court and jury settle," does not authorize a reference to arbitrators; nor will authority to exercise a reasonable discretion, or to submit to a reasonable sacrifice, confer such a power. See also Wallace v. The Br. Bank at Mobile, 1 Ala. Rep. 565; Hewes v. Doddridge, 1 Robinson's Rep. 143; Fisher v. Campbell, 9 Port. Rep. 210; Falls v. Gaither, Id. 605; Smith v. Gibson, 6 Blackf. Rep. 369.

Dearing v. Lightfoot.

Although the acts of an agent may be inoperative against his principal, yet it is competent for the latter to ratify them. The ratification of the act of one professing to act as agent, with knowledge of the facts, has the same effect as if the previous authority of the agent had been ample, especially in a case, where the person to be affected was not privy to the act of the supposed agent. Reynolds v. Dothard, et al. 11 Ala. Rep. 531. But where a third person acquires rights after the act is done, and before it has received the sanction of the principal, the ratification cannot operate retrospectively, so as to overreach and defeat those rights, and it has accordingly been held, that where one, acting as an agent of a third person, went beyond his authority in making an assignment of debts due his principal, and a creditor of the principal caused a garnishment to be served upon his debtor, whose estate was assigned, the subsequent ratification of the assignment by the principal could not defeat the lien of the garnishee. Wood v. McCain, *supra*, and citations in the opinion.

In determining the extent of the agent's power in the case before us, every thing that the principal said in respect to his conversation with the plaintiff, in which he avowed to him the intention to provide for the payment of the mortgage debt, by a transfer of half the negroes, embraced by the mortgage, to his, the mortgagee's son-in-law, and by an assignment of bank stock to the mortgagee, may be placed out of view. It cannot explain the written power previously given, nor even enlarge the interpretation of the subsequent verbal authority.

It is testified by the mortgagor that when he left Courtland, in December 1841, he had given no special authority to his agent to sell the slaves in question, but some years previously he gave his agent a general power of attorney, *to act for him in all cases whatever, and to do all which he himself might do;* that on parting with his son (who was the agent referred to) the mortgagor told him *to settle up all demands against the family before he should set off for Montgomery, and, acting under the power above referred to, to do all that might be necessary.* The mortgagor deposed further, that *the slaves, Solomon and Hercules, were sold by his agent under a general power (verbally given) to discharge all demands against the family before he left Court-*

*land for Montgomery.* It was also proved that the mortgagor removed his slaves from Tennessee to Lawrence county, in this State in 1832; that he was about removing his family "back to Georgia," in the winter of 1841 & '42; that he had previous to his return to Georgia, a plantation in Alabama; that he had given no special authority to his agent to sell the slaves, Solomon and Hercules, previous to his departure from Alabama, but they were sold under the general power, verbally given, to discharge all demands against the family before he left Courtland for Montgomery.

The agent testified that he sold the slaves in question under a general power of attorney from the mortgagor to manage all his business in the State of Alabama. This power has been either lost or destroyed.

The terms, if such as the mortgagor supposes, would constitute a universal agent. Mr. Justice Story admits that such an agency may *potentially exist,* but *adds* that it must be of the rarest occurrence. Indeed, says he, it is difficult to conceive of its existence practically, inasmuch as it would be to make such an agent, the complete master, not merely *dux facti,* but *dominus rerum,* the complete disposer of all the rights and property of the principal. However this may be, we have seen that such an unlimited and unusual power will never be inferred from expressions, however broad, but will be restricted to the particular business in respect to which, it was intended to delegate the authority.

It must be admitted that the testimony is not as precise and definite as it could be desired, and as it doubtless would have been, if the witnesses had been more specially interrogated. But we gather from the evidence, that the mortgagor had a plantation in Lawrence county, on which the slaves in controversy were laborers and that the *general power of attorney* referred to his business in Alabama. In this view, although the authority may have been general, it must be restricted as to the field of its operation, and the manner in which it is to be exercised must be determined by the nature of the mortgagor's business. As it respects the present case, we shall consider the business to have been planting.

A general agency to manage, direct and superintend a plantation does not confer the power to sell the plantation,

or the slaves which are placed there to cultivate it, or otherwise assist in promoting its operations. If it were allowable to sell one acre under such authority, at what point would a limitation be fixed, and if one slave might be sold, upon the same principle, could not all of them be disposed of in like manner? We cannot perceive any middle ground, beyond which the agent shall not go, if the right to sell be conceded to him. Instead of conducting and managing the business for the interest of his principal, he might entirely arrest and destroy it; and this although the proceeds of the sale might be misapplied, and never received by the principal. It would certainly be competent for such an agent to employ and dismiss overseers, to sell the crops, to purchase necessary stock, &c., but he could not break up the business which it was the purpose of his agency to promote.

The power to *settle* all demands against the principal's family, before the agent left " Courtland for Montgomery," or even to *discharge* them would not we have seen authorize the agent to make a note, or submit to arbitration; and we think it cannot authorize him to sell the slaves of his principal, which were about to be removed from the plantation. The fact, that the money received by the agent for the slaves was appropriated to the payment of the debts of the principal can make no difference; certainly not, unless the principal was aware of such appropriation, and did not object, or assented to it, before the plaintiff's rights under the mortgage became known to the purchaser. Smith & Co. v. Zurcher, use, &c., 9 Ala. Rep. 208; Daniel v. Sorrells and another, Id. 436. After that time, the mortgage would become as operative against the purchaser, as if it had then been executed anew and recorded, but it could acquire no greater force. If, therefore, the mortgagor, upon being informed of it, approved and sanctioned the sale which his agent had made, previous to the defendant being informed of the existence of the mortgage, such a ratification would give to the defendant a title to the slaves, which would prevail against an unregistered mortgage of which he had no notice.

The fact that the mortgage was executed in Georgia, did not dispense with the necessity of registration, in order to make it valid as a security against creditors and purchasers,

if the possession did not vest in the mortgagee, or there was no actual notice of its existence, or any thing else which the law considers equivalent. The slaves were in this State, and this was quite sufficient to subject the mortgage to the influence of our registry laws, applicable to such a security. Adams v. Broughton, 13 Ala. Rep. 731, instead of opposing, rather favors the conclusion we have stated; though it must be conceded, the precise question did not there arise. See also Smith v. Zurcher, use, &c., 9 Ala. 208.

We cannot undertake to adjudicate the facts, and say that the ratification of the sale was made under such circumstances as to impart to it validity against the plaintiff. It is the appropriate office of the jury to scan the testimony, and to determine what part of it shall be credited, and what rejected; this duty cannot be assumed by the Judge. We cannot therefore say that the plaintiff has not been prejudiced by the refusal of the circuit court to give to the jury the instructions he prayed. They were suggested by the testimony—were pertinent, and, according to repeated decisions of this court, should have been given in the terms in which they were asked. If other instructions were necessary to have placed the cause upon its true grounds, the defendant could have then asked the court to give them. Whether any others were proper or could have availed, upon the proof set out in the bill of exceptions, we do not pretend to intimate. It follows that the judgment must be reversed, and the cause remanded.